UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

In re LIGHTSQUARED, INC., et al.,      :
        :
     Debtors.      :
        :

------------------------------------------------------------------X

SP SPECIAL OPPORTUNITIES, LLC,    :
        :
     Appellant,     :
        :
     -v-     :
        :
LIGHTSQUARED INC., et al.,    :
        :
     Appellees.     :

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 7, 2015

15-cv-2848 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

     This is a second appeal from the Bankruptcy Court's (Chapman, J.) order

dated March 27, 2015, confirming the debtors'[1] Modified Second Amended Joint

Plan Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan").[2]  (Appellant SP

Special Opportunities, LLC's Appendix on Appeal ("App.") at A00001-216, Bankr.

Dkt. No. 2276, ECF No. 7-2.)  At the time of confirmation, the sole remaining

objections to the Plan were those of's former Chief Executive Officer ("CEO"), Sanjiv

---

[1] The Chapter 11 debtors are LightSquared Inc, LightSquared Investors Holdings Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra RollupSub LLC, SkyTerra Investors LLC, TMI Communications Delaware, Limited Partnership, LightSquared GP Inc., LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared Bermuda Ltd., SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., and One Dot Six TVCC Corp.  These entities are collectively referred to as "LightSquared" or "the Debtors".

[2] The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This Court has jurisdiction to hear appeals from final judgments, orders and decrees of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1).  "The confirmation of a plan in a Chapter 11 proceeding is an event comparable to the entry of a final judgment in ordinary civil litigation."  In re American Preferred Prescription, Inc., 255 F.3d 87, 92 (2d Cir. 2001) (citations omitted).

Ahuja, the subject of this Court's prior Opinion & Order in this matter. (See App. A00323, March 26, 2015 Confirmation Hearing Tr. 104-06, Bankr. Dkt. 2312.)

This second appeal is brought by SP Special Opportunities, LLC ("SPSO"), the largest unsecured lender to one of the debtors, LightSquared LP ("LP"). (Notice of Appeal, ECF No. 1.) DISH Network Corporation ("DISH") and EchoStar Corporation ("EchoStar") filed a document entitled "Joinder and Statement of DISH Network Corporation and EchoStar Corporation in Support of Appeal of Appellant [SPSO]." (ECF No. 14.) Neither of these entities filed its own Notice of Appeal. SPSO is wholly-owned and controlled by Charles Ergen, co-founder, Chairman and CEO of DISH; Ergen also separately holds the position of Chairman of EchoStar. (Appellant's Br. 2, ECF No. 7.)

SPSO appeals the Bankruptcy Court's inclusion of a particular injunctive provision (which the parties refer to as "Injunction B") in its Order Confirming Modified Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code ("Confirmation Order"). SPSO argues that Injunction B both (1) inappropriately extends the jurisdiction of the Bankruptcy Court post-confirmation, and (2) is framed too broadly and without sufficiently definite terms, thus failing to comply with the requirements of Fed. R. Civ. P. 65. For the reasons set forth below, the Court agrees with SPSO's latter proposition. The Court therefore vacates Injunction B and remands for the Bankruptcy Court's reconsideration.

I.      FACTS PERTINENT TO THIS APPEAL[3]

The injunction at issue on this appeal originated in the events commencing in May 2012, when LightSquared commenced a voluntary bankruptcy case pursuant to chapter 11 of the Bankruptcy Code.  In re: LightSquared Inc., 511 B.R. 253, 262-63 (Bankr. S.D.N.Y. 2014).  An adversary proceeding was commenced by one of the debtors on August 6, 2013, against Ergen, DISH, EchoStar, an acquisition vehicle named "L-Band Acquisition, LLC ("LBAC"), SPSO and others, alleging, inter alia, inequitable conduct.  Id. at 263.  LightSquared intervened in that proceeding a few weeks later.  Id.  The adversary proceeding arose from SPSO's and Ergen's conduct in connection with Ergen's (through SPSO) acquisition of approximately $844 million dollars of the senior secured debt of LightSquared LP during the period from April 2012 through April 2013.  Id. at 260-61.  LightSquared asserts that it was this conduct that prompted the inclusion of Injunction B in the Plan.  As a result, the Bankruptcy Court's findings with respect to Ergen's and SPSO's conduct are relevant to this appeal.

A.   Adversary Proceeding on Equitable Subordination

The Bankruptcy Court held a trial in the adversary proceeding, at which Ergen and a number of other individuals testified.  The Court was seeking to determine whether SPSO's claim against the estate based on the debt Ergen had acquired should be disallowed or, alternatively, whether it should be equitably

[3] The procedural history of this matter is set forth in the Bankruptcy Court's July 11, 2014 decision denying confirmation of debtors' Third Amended Joint Plan, In re: LightSquared Inc., 513 B.R. 56 (Bankr. S.D.N.Y. 2014), as well as its March 27, 2015 Confirmation Order (App. A00001-216).  The Court recites here only those facts necessary to its decision on this appeal.

subordinated by virtue of SPSO's conduct in connection with its debt purchases and/or in connection with these chapter 11 cases.  Id. at 261.  The Court found that SPSO's (and through it, Ergen's) conduct was such as to warrant equitable subordination in an amount to be later determined.  Id. at 315.

The Court made a number of findings of fact in support of its decision, including that Ergen used SPSO (and a company called Sound Point) as a front for purchases he made from a personal account.  Id. at 275-76.  Ergen's goal was to obtain a blocking position in LP's debt to allow SPSO to enforce "certain rights" during the bankruptcy proceeding.  Id. at 280.  The Court found that Ergen acted, in part, to benefit DISH and that members of DISH's and EchoStar's management and boards were aware of his actions.  Id. at 281.  Ergen was involved in managing the strategic direction of DISH and EchoStar and this included the companies' attempts to acquire or merge with spectrum-owning companies.  Id.  Pursuant to that end, DISH contemplated making a bid for LP.  Id. at 288.  But before DISH acted, Ergen himself submitted a bid for LP's spectrum assets for $2 billion.  Id. at 289.  The Court found that LP was a strategic investment for DISH and EchoStar, and not a personal investment by Ergen.  Id. at 293-97.  Among its bases for that determination, the Court found that "DISH and EchoStar have a history of purchasing distressed or discounted debt of their targets as a step toward an eventual acquisition, including acquiring a blocking position in distressed satellite companies in bankruptcy, such as DBSD and TerreStar, enabling them to acquire

4

the companies' spectrum assets at a discount." Id. at 294.[4]  The Court further found that LightSquared's spectrum assets filled a need for DISH and EchoStar because LightSquared had "the only significant source of available uplink spectrum to acquire" and found that Lightsquared's spectrum could be paired with the existing spectrum that DISH and Ergen had previously acquired from DBSD.  Id. at 295.

The Bankruptcy Court found that Ergen and SPSO engaged in various actions to thwart LightSquared's efforts to complete its reorganization plan.[5]  For instance, it found that SPSO delayed closing hundreds of millions of dollars in LP debt trades for several months, during a critical time in LightSquared's bankruptcy case, and that it had engaged in a "stunning lack of candor" on this issue.  Id. at 305, 346.  The Court found that Ergen had taken actions to insure that the delays occurred—it also found that the delays were unrelated to any true business need and provided no economic benefit.  Id. at 306-308.  SPSO's failure to close the trades did, however, impede LightSquared and the Ad Hoc Secured Lender Group's efforts to work out a consensual plan of reorganization.  Id. at 311.  Sound Point (the other company that Ergen used as a front) took additional actions which further impeded completion of a reorganization plan, including buying additional large blocks of debt; this prevented LightSquared from knowing with whom it needed to deal to complete reorganization.  Id.  In June 2013, after Ergen revealed his LP debt

---

[4] For instance, DISH acquired DBSD through the bankruptcy process by first acquiring a blocking position in DBSD's first lien debt.  Id. at 294.  DISH acquired DBSD's "AWS-4" spectrum in March 2012 and had still not deployed it as of January 2014.  Id.
[5] The Court also found that Ergen contributed to LightSquared's need to seek bankruptcy protection in the first place when he gave instructions to vote against a brief forbearance that would have allowed negotiations between LightSquared and its debt holders to continue.  Id. at 319.

holdings, SPSO joined the Ad Hoc Secured Group and, by virtue of its debt holdings as of that time, became the controlling member. Id. at 311-13. From its position within the Ad Hoc Group, SPSO prevented a consensual deal from being reached. Id.

The Bankruptcy Court found that while SPSO's debt purchases were not technically prohibited, they violated the "Eligible Assignee" provision in certain of LightSquared's loan agreements. Id. at 315-16. That provision prohibited direct competitors of LightSquared (the borrower) from acquiring the LP's debt. Id. at 315-16. DISH and EchoStar were expressly included on a scheduled list of disqualified companies. Id. Although SPSO was an "Eligible Assignee" as a technical matter, the Court determined that its acquisition of LP debt violated the spirit of the loan agreement. Id. at 317.

The Court concluded that, based on its numerous and detailed findings of fact, "the conduct of Mr. Ergen and SPSO, undertaken on behalf of or for the benefit of DISH, was an end-run around the Eligible Assignee provisions of the Credit Agreement that breached the implied covenant of good faith and fair dealing arising under the Credit Agreement." Id. at 333. Relying on SPSO's violation of the covenant of good faith and fair dealing and its misconduct in connection with the delayed closing of LP debt trades, the Court ultimately concluded that although SPSO's claim was not void or voidable and therefore would not be disallowed, it was appropriate to equitably subordinate SPSO's claim to the extent of any injury to innocent creditors. Id. at 339-41, 345-46.

B. <u>Rejection of Third Amended Joint Plan</u>

A month after the Bankruptcy Court issued its decision on equitable subordination, on July 11, 2014, it denied confirmation of the Debtors' "Third Amended Joint Plan." <u>In re: LightSquared Inc.</u>, 513 B.R. 56 (Bankr. S.D.N.Y. 2014). The Court found, <u>inter alia</u>, that the Third Amended Joint Plan was not fair and equitable with respect to a particular class of secured claims.[6] <u>Id.</u> at 93. In rendering its decision, the Court referenced its findings in the adversary proceeding with regard to SPSO and Ergen's conduct, and incorporated a number of those specific findings directly. <u>See id.</u> at 86-89. The Court reiterated that SPSO's claim was subject to equitable subordination on the basis of its conduct, referencing specifically the failure to close trades and Ergen's alleged submission of a personal bid for LightSquared's assets when in fact the bid was for the benefit of DISH. <u>Id.</u> at 85-86.

The Court also referenced a series of communications between Ergen and executives of Inmarsat that had occurred during the first quarter of 2014—while the adversary proceeding was pending—at which "Ergen discussed LightSquared even though LightSquared [wa]s currently negotiating a modification of its cooperation agreement with Inmarsat and such modification [wa]s a condition of the Plan." <u>Id.</u> at 87-88. It also referenced communications between SPSO, Ergen and FCC personnel regarding DISH's plans for LightSquared if DISH were to ultimately acquire it. <u>Id.</u> at 87. Based upon these facts, the Court concluded that "SPSO must

---

[6] SPSO had objected to this plan.

be viewed as a competitor of the Debtors with significant 'non-creditor' interests, or, in the alternative, [that] SPSO is an affiliate of a competitor controlled by SPSO's ultimate owner, Mr. Ergen." Id. at 88-89.

### C. Confirmation of Modified Second Amended Joint Plan

After further negotiations, a Modified Second Amended Joint Plan was proposed.  That plan, which was approved (and thus became the operative "Plan" as defined above), included standard and non-standard injunctions.[7]  Similar to many chapter 11 reorganizations of large companies, the Plan includes an injunction that, inter alia, prevents entities whose claims have been released in the reorganization from taking actions against the debtors to pursue any released claims, attaching any property or enforcing any liens with regard to such claims or otherwise continuing any actions settled as a result of the Plan.  (Confirmation Order ¶ 36.a, App. A00076-77.)  The parties refer to this provision as "Injunction A."[8]

A second injunction ("Injunction B") was included in the Plan at the last minute.[9]  It provides, in pertinent part:

> No Holder of any Claim or Equity Interest, and none of any such Holder's heirs, successors, assigns, trustees, executors, administrators, controlled-affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, and/or guardians (collectively the "Representatives") shall take, or cause to be taken, and each such

---

[7] The Bankruptcy Court's Order Confirming Modified Second Amended Joint Plan recites that the Court "considered the entire record of the Confirmation Hearing," including, inter alia, the objection of SPSO and SPSO's notice of withdrawal of such objection.  (App. A00004-06.)

[8] In connection with the instant appeal, SPSO submitted twenty examples of injunctions entered in similarly-sized reorganization proceedings.  (See Appellant's Br., Annex A (ECF No. 7-1).)  Those injunctions are similar to Injunction A.  None include an injunction in the form of Injunction B.

[9] While the inclusion of Injunction B in the Modified Second Amended Joint Plan was somewhat belated, the Bankruptcy Court gave all parties an opportunity to be heard with regard to its inclusion.

Holder and each of its Representatives is hereby permanently enjoined from taking, any action that is intended or is reasonably likely to directly or indirectly prevent, impede, hinder, adversely affect, and/or delay any actions or efforts of the Debtors or the Reorganized Debtors, as applicable, and/or their ability to: (i) implement the Plan and the Plan Transactions[10] (including, but not limited to, performance and/or enforcement of contracts of LightSquared or the Reorganized Debtors); (ii) obtain any consents and/or approvals, achieve the expiration or termination of any waiting period, and/or take any actions necessary or appropriate to consummate the transactions contemplated in the Plan and this Order, including, but not limited to, under . . . (B) the rules and regulations of the FCC . . . including, but not limited to, with respect to the assignment, transfer of control, and/or maintenance of the Debtors' FCC . . . licenses and authorizations (collectively the "<u>Transfer Proceedings</u>"); (iii) obtain any grant of the License Modification Application or any Material Regulatory Request, as amended and/or supplemented from time to time, and/or any associated rulemaking, waiver, and/or other requests regarding the subject matter thereof, or the satisfaction of any FCC Objective; or (iv) undertake any acts related to, or in furtherance of, the matters described in clauses (i), (ii), and/or (iii) in this subparagraph; <u>provided, however</u>, that nothing in this Order shall prevent or enjoin anyone from communicating with or otherwise exercising their right to petition any Governmental entity, including the FCC, for any reason – including, but not limited to, any communications or petitions concerning the matters set forth in this paragraph.

(Confirmation Order ¶ 36.b, App. A00077-78.)  The Bankruptcy Court held a hearing on confirmation of the Plan, including Injunction B as set forth above, on March 26, 2015.  (<u>See</u> App. A00219-00388.)  During that hearing, counsel for the Debtors (Matthew S. Barr of Milbank, Tweed, Hadley & McCloy, LLP) informed the Court that "as part of the confirmation order, we did make changes to certain

---

[10] Plan Transactions are defined as "one or more transactions to occur on or before the Effective Date or as soon thereafter as reasonably practicable, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: . . . (c) all other actions that are consistent with the terms of the Plan and that the New Investors, the Debtors, Reorganized LightSquared Inc. or New LightSquared, as applicable, determine are necessary or appropriate."  (App. A00130.)

9

language in the injunction section . . . at the request of the United States trustee as well as the . . . U.S. Attorneys' Office . . . ."  (App. A00232.)  Co-counsel for the Debtors (Andrew LeBlanc) later described the changes as follows:

> [W]hat we have done is taken out the communication with federal, state, local government body of any type in that parenthetical and we've replaced it at the end with a proviso[;] this makes clear that nothing in this order shall prevent or enjoin anyone from communicating with or otherwise in exercising their right to petition any governmental entity including the FCC for any reason including, but not limited to, any communications or petitions concerning the matters set forth in this paragraph.

(App. A00305-06.)  The Court then confirmed that the changes were acceptable to the U.S. Attorney's Office.  (App. A00306.)  While the U.S. Attorney's Office found the Plan acceptable, the United States Department of Justice, on behalf of the United States Trustee ("Trustee"), expressed concern regarding the scope of Injunction B.  The Trustee explained:

> The way [Injunction B is] written, it really appears that the Court will be permanently enjoining anything that has to do with LightSquared, whether or not affiliated with the bankruptcy.  And Federal Rule 65 really provides for injunctions to be specific and more narrowly tailored and the U.S. Trustee believes it should be scaled back to an injunction related specifically to the plan and extend through the effective date.

(App. A00307-08.)[11]

When given its opportunity to speak, SPSO aired concerns that were similar to the Trustee.  Counsel for SPSO (Tariq Mundiya of Willkie Farr & Gallagher LLP), commented:

---

[11] The Trustee also raised a concern about the scope of jurisdiction created by Injunction B.  (See App. A00308.)  Responding to that issue, the Court explained, "You of course know and I will be the first to admit that I can't create jurisdiction . . . .  So the jurisdiction is only to the extent that it exists under applicable law."  (App. A00308.)

> We have withdrawn our objection to the Plan . . . .   We are here for a very limited purpose to talk about this provision of the confirmation order which we got this morning in its revised form . . . the injunction itself purports to regulate conduct after the effective date.

(App. A00309-10.)  The Court then asked what it was that SPSO believed the injunction prevented it from doing.  (App. A00310.)  Mundiya continued,

> We don't want to do anything.  We just think the way it's drafted, it should be scaled back through and including the effective date because what that means it makes sure the injunction is not unlimited in time, unlimited in scope, unlimited in breadth.

(App. A00310.)  SPSO also argued that the injunction was deficient under Rule 65 because it was lacking in specificity and was "incredibly broad."  (App. A00310.)  The Court then heard from DISH (represented by Brian D. Glueckstein of Sullivan & Cromwell LLP) who expressed concern that as drafted, Injunction B purported to "restrict regular commercial activity" and "was not tailored to the effective date." (App. A00311.)  Counsel for the Debtors then responded that:

> There is a history[;] this provision was something that was important to us here.  Because of our – the history that my firm had in DBSD. Because there were efforts in DBSD to disrupt the Plan. Your Honor may recall that from that record that it took eighteen months before we got approval of a change of control from the FCC because of efforts to present that because of the effect that it might have on the appeal . . . .  We had genuine concerns and there is real reason for this and in particular this case when you have an entity or ultimately a person who has been found to [have] acted inequitably on the basis of subordination, there is no question and we believe it is narrowly tailored to the issues before the Court . . . .

11

(A00314.)[12]  On March 27, 2015, the Bankruptcy Court approved Injunction B in the form set forth above and confirmed the Plan.  SPSO's appeal of that Order followed.

## II.    THIS APPEAL

This appeal raises three issues, the first two of which were briefed by the parties.  The third was raised by the Court as logically flowing from the first two, and each party had an opportunity to respond to that issue.  In that order, the issues are (1) whether Injunction B implicitly (and properly) assumes ongoing jurisdiction by the Bankruptcy Court of jurisdiction to enforce its terms after the Effective Date, (2) whether Injunction B is too vague and too broad, and (3) whether Injunction B is supported by sufficient factual findings.

The record on appeal was, pursuant to Fed. R. Bankr. P. 8009, designated by Appellant SPSO on May 8, 2015.  (ECF No. 5.)  The Debtor-Appellees designated additional items, including the entire trial record from the adversary proceeding.  (ECF No. 6.)  Appellant SPSO did not move to strike any of the designated additions, as it could have done pursuant to Fed. R. Bankr. P. 8009(e).  The appellate rules provide for automatic inclusion of any opinion, findings of fact and conclusions of law, relating to the issues on appeal.  Fed. R. Bank. P. 8009(a)(4).  The record therefore includes the two prior decisions of the Bankruptcy Court discussed above, from June and July 2014.  See 511 B.R. 253; 513 B.R. 56.

---

[12] The DBSD proceeding has nothing to do with LightSquared's bankruptcy, though Ergen was apparently involved in both.  The "history" to which counsel referred is therefore not exclusively based on the record in the LightSquared bankruptcy proceeding.

III.    STANDARD OF REVIEW

The district court acts as the first level of appellate review from orders of a bankruptcy court.  See 28 U.S.C. § 158(a); Fed. R. Bankr. P. 8001(a).  When sitting as an appellate court, the district court may "affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."  28 U.S.C. § 2106.  The standard of review for the grant of a permanent injunction is abuse of discretion.  In re Bernard L. Madoff Inv. Sec. LLC, 740 F.3d 81, 87 (2d Cir. 2014).  Thus, a bankruptcy court's conclusions of law are reviewed de novo and findings of fact are reviewed for clear error.  Id.; see In re Ames Dep't Stores, Inc., 582 F.3d 422, 426 (2d Cir. 2009) ("We will determine that a finding is 'clearly erroneous' when we are left with the definite and firm conviction that a mistake has been made.").  Mixed questions of law and fact are subject to de novo review.  AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 209 (2d Cir. 2000).

IV.    DISCUSSION

A.    Post-Confirmation Jurisdiction

SPSO asserts that Injunction B does not have a specified duration and, according to its terms, may extend well beyond the Effective Date of the Plan. Enforcement of any violation of Injunction B necessarily implies continuing

jurisdiction—post-confirmation—by the Bankruptcy Court.  This is certainly true.
That alone, however, is not fatal.

Bankruptcy jurisdiction is governed by 28 U.S.C. § 1334.  Section 1334 vests
original jurisdiction in the district courts of "all civil proceedings arising under title
11, or arising in or related to cases under title 11."  Id. § 1334(b).  The Southern
District of New York has, by standing order, delegated its authority in this regard
to the Bankruptcy Court.  In re Standing Order of Reference Re: Title 11, 12 Misc.
00032 (S.D.N.Y. Feb. 1, 2012).  The Bankruptcy Court thus has what is commonly
referred to as "related to" jurisdiction.  See, e.g., In re Robert Plan Corp., 777 F.3d
594, 597 (2d Cir. 2015); see also In re Boston Regional Med. Ctr., Inc., 410 F.3d 100,
105 (1st Cir. 2005).  "Related to" jurisdiction is quite broad and extends to cases in
which the outcome of litigation could potentially have some effect on the bankruptcy
estate, or on the administration of the estate.  In re Robert Plan Corp., 777 F.3d at
597; see In re Petrie Retail, Inc., 304 F.3d 223, 230 (2d Cir. 2002) ("A bankruptcy
court retains post-confirmation jurisdiction to interpret and enforce its own
orders.").  Bankruptcy courts have been expressly granted jurisdiction to enter
injunctive orders that are "necessary for the consummation of the [reorganization]
plan."  11 U.S.C. § 1142(b).

"On its face, section 1334 does not distinguish between pre-confirmation and
post-confirmation jurisdiction."  In re Boston Regional Med. Ctr., 410 F.3d at 106.
However, liquidation plans are often treated differently in this regard from plans of
reorganization.  Id.  "Courts that have limited the scope of post-confirmation

jurisdiction have based their holdings on the conclusion that, once confirmation has occurred, fewer proceedings are actually related to the underlying bankruptcy case." Id.  In a reorganization, a company emerges from bankruptcy and "is attempting to make a go of its business;" that intention is absent in the context of a liquidation. Id. at 107.

The Second Circuit has long stated a preference for courts to relinquish jurisdiction over the debtor estate as soon as practicable.  See North Am. Car Corp. v. Peerless Weighing & Vending Mach. Corp., 143 F.2d 938, 940 (2d Cir. 1944) ("Since the purpose of reorganization is to rehabilitate the business and start it off on a new and to-be-hoped-for more successful career, it should be the objective of courts to cast off as quickly as possible all leading strings which may limit and hamper its activities and throw doubt upon its responsibility.").[13]  Notably, however, the Second Circuit has not ruled out continuing jurisdiction.  Cf. In re Johns-Manville Corp., 7 F.3d 32, 34 (2d Cir. 1993) (finding that the terms of a reorganization plan specifically excepted certain objections from post-confirmation jurisdiction and stating, "A bankruptcy court retains post-confirmation jurisdiction in a chapter 11 proceeding only to the extent provided in the plan of reorganization.").  The Second Circuit has further elaborated that "[a] party may invoke the authority of the bankruptcy court to exercise post-confirmation jurisdiction only if the matter has a close nexus to the bankruptcy plan, and the

---

[13] The Seventh Circuit has similarly stated a preference for bankruptcy courts to quickly relinquish jurisdiction after reorganization.  See Pettibone Corp. v. Easley, 935 F.2d 120, 122 (7th Cir. 1991) ("Formerly a ward of the court, the debtor is emancipated by the plan of reorganization.").

plan provides for the retention of such jurisdiction." In re Euro-American Lodging Corp., 549 F. App'x 52, 54 (2d Cir. 2014) (summary order) (citation omitted); see also Allstate Ins. Co. v. Ace Sec. Corp., No. 11 Civ. 1914(LBS), 2011 WL 3628852, *4 (S.D.N.Y. Aug. 17, 2011) (holding that "close nexus" test for bankruptcy jurisdiction was met where indemnification case affected "the interpretation, implementation, consummation, execution, or administration of the confirmed plan").

SPSO argues that Injunction B inappropriately extends the Bankruptcy Court's jurisdiction because it could be invoked post-confirmation and post-Effective Date to enjoin activity unrelated to the Plan.  At the outset, this Court concludes that Injunction B, at least on its face, has a sufficiently "close nexus" to the implementation and enforcement of the Plan such that it may fall within the Bankruptcy Court's jurisdiction; the Bankruptcy Court, given its substantial background knowledge of this case, knew of SPSO's past efforts to thwart a successful reorganization and the likelihood that those efforts would continue following confirmation of the Plan.[14]  Further, this Court disagrees that there is some absolute delineation between a Bankruptcy Court's jurisdiction pre- and post-confirmation.  It is certainly true that in most cases there is no need for continuing jurisdiction, and indeed there is a strong preference to terminate jurisdiction. However, the Court does not read section 1334 and the case law in this Circuit as

---

[14] SPSO's primary ground for asserting that Injunction B lacks a close nexus to LightSquared's bankruptcy proceeding is that the injunction is overly broad.  While the Court agrees, as set forth below, that the injunction is impermissibly indefinite and overly broad, the Court believes that in this facial challenge to the injunction, SPSO's argument raises less of a jurisdictional issue and more of a question of the Bankruptcy Court's compliance with the requirements of Fed. R. Civ. P. 65.

drawing a hard line that provides an easy answer.  Instead, the statute and case law caution courts to cut any jurisdictional threads as soon as practicable, leaving the decision as to when that is best done to the Bankruptcy Court in the first instance.

Here, the FCC proceedings with regard to spectrum critical to LightSquared's business—the same spectrum that is so enticing to DISH—may continue for several years.  The FCC's ultimate decision will have enormous impact on the reorganized LightSquared.  But one day, that proceeding will have concluded, the FCC's decision made, and LightSquared will move on with its business.  It seems as certain as these things can be that at that point there would be little apparent justification for continuing jurisdiction.  Whether any oversight by the Bankruptcy Court is, however, needed between now and then is a matter as to which the Bankruptcy Court should make an initial and clear determination.  This Court, therefore, rejects SPSO's jurisdictional argument at this time.

## B. The Scope of Injunction B and Compliance with Rule 65

SPSO argues that even if the Bankruptcy Court has jurisdiction to impose ongoing injunctive relief, Injunction B fails because it is overly broad and lacks the specificity required by Rule 65.  The Court agrees.

As an initial matter, the parties debate whether Injunction B was issued pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 3020(c)(1), or Rule 65 of the Federal Rules of Civil Procedure.  The answer is "both."  As an equitable decree requiring restraint under the threat of contempt, it is an order

falling within Rule 65; but it is also an order issued under the umbrella of the Bankruptcy Court's authority under 11 U.S.C. 105(a).  See U.S. Dep't of Air Force v. Carolina Parachute Corp., 907 F.2d 1469, 1475 (2d Cir. 1990) (applying Rule 65 to confirmation injunction); cf. Int'l Longshoremen's Ass'n, Local 1291 v. Phil. Marine Trade Ass'n, 389 U.S. 64, 75 (1967) (equitable decree commanding action under the threat of contempt, issued pursuant to the Norris-LaGuardia Act, fell within the ambit of Rule 65 and therefore had to meet its requirements).

Rule 65 provides that every injunction must "state the reasons why it is issued", "state its terms specifically", and "describe in reasonable detail—and not by referring to another document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).[15]  These provisions "are no mere technical requirements."  Schmidt v. Lessard, 414 U.S. 473, 476 (1974).  Rule 65 requires "that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid."  Int'l Longshoremen's Ass'n, 389 U.S. at 76; see Rosen v. Siegel, 106 F.3d 28, 32 (2d Cir. 1997).  The requirements mandated by Rule 65 "reflect[ ] Congress' concern with the dangers inherent in the threat of a contempt citation for violation of an order so vague that an enjoined party may unwittingly and unintentionally transcend its bounds."  Sanders v. Air Line Pilots Ass'n, Int'l, 473 F.2d 244, 247 (2d Cir. 1972).  The Second Circuit has also cautioned that injunctive relief should not be "broader than necessary to cure the effects of the

---

[15] Bankruptcy Rule 3020(c)(1) likewise requires, inter alia, that an injunction "describe in reasonable detail all acts enjoined" and that it "be specific in its terms regarding the injunction."  Fed. R. Bankr. P. 3020(c)(1).  To the extent that Injunction B fails to adhere to the requirements of Rule 65, it also appears to fail those of Bankruptcy Rule 3020(c)(1).

harm caused by the violation" and should be "narrowly tailored to fit specific legal violations." City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 144 (2d Cir. 2011) (citations and quotation marks omitted).

In its Order confirming the Plan, the Bankruptcy Court did not make specific findings of fact with regard to the conduct which Injunction B makes necessary. See Clarkson Co., Ltd. v. Shaheen, 544 F.2d 624, 633 (2d Cir. 1976).  Without such findings, the reader is left without clear guidance as to the specific conduct found problematic and enjoined in its future incarnations.

The findings which are included within the Bankruptcy Court's Order confirming the Plan do not directly address Injunction B or the issues raised by it. The Confirmation Order does, however, incorporate by reference the Court's prior orders, including that of July 11, 2014.  (App. A00007.)  The July 2014 decision included a large number of detailed and well supported findings of fact which may well support injunctive relief.  See, e.g., 513 B.R. at 84-90.  SPSO does not challenge any of those findings in this appeal.  For instance, after hearing from Ergen extensively at trial and evaluating all of the evidence, the Bankruptcy Court found that "it is not hard to conjure a set of facts and circumstances in which [Ergen] personally would benefit more from LightSquared's failure than its success." Id. at 85.  The Court found further,

> As Mr. Ergen himself made clear in pursuing his so-called personal bid for LightSquared's spectrum through LBAC, preserving optionality for DISH is a hallmark of his ongoing strategy for DISH in these cases, and more generally.  Optionality for DISH should not come at the expense of the interests of LightSquared's creditors who do not share Mr. Ergen's economic interests and lifelong commitment to DISH.

19

Id. (citation omitted).  This finding supports the basic requirement that to support injunctive relief, a court must find there exists some "cognizable danger of recurrent violation."  See United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953).[16]

Assuming a factual basis for some injunctive relief based upon Ergen and SPSO's prior conduct, Injunction B nevertheless lacks the requisite specificity. Sanders, 473 F.2d at 247 ("The normal standard of specificity is that the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden." (citation omitted)).  Injunction B also fails because it is far broader than necessary in light of that arguable factual basis.[17]

Injunction B "permanently enjoins" the parties from taking a series of action. (Confirmation Order ¶ 36.b, App. A00077.)  As an initial matter, the permanent injunction—without an endpoint—is too indefinite.[18]  See Pettibone, 935 F.2d at 122 (After confirmation of a plan of reorganization, a debtor may not forever "come running to the bankruptcy judge every time something unpleasant happens.").  But a second issue arises from the identity of the parties enjoined.  The provision casts a broad net over all Holders of any claim or Equity Interest, as well as their "heirs,

---

[16] The Court notes that even if the Bankruptcy Court intended its prior findings to serve as the basis for Injunction B, the Bankruptcy Court nonetheless failed to specifically state the reasons why it issued Injunction B and what particular conduct it covers, as required by Rule 65.  Fed. R. Civ. P. 65(d)(1).  That absence makes it difficult for this Court to understand the Bankruptcy Court's precise reasoning.  See Patsy's Italian Rest., Inc. v. Banas, 658 F.3d 254, 273 (2d Cir. 2011) (stating that the requirement that the order granting the injunction "state the reasons why it issued . . . ensures that an appellate court is able to understand the reasons for the injunction" (quotation marks and citation omitted)).

[17] In this regard, the Court notes that counsel's reference at the Plan confirmation hearing to his firm's history in the "DBSD" proceeding is not a basis for an injunction in this, unrelated proceeding.

[18] Injunction B's indefiniteness is particularly problematic in light of the scope issues that the Court addresses below.

20

successors, assigns, trustees, executors, administrators, controlled affiliates, officers, directors, agents, representatives," etc. (Confirmation Order ¶ 36.b, App. A00077.)  Entangled in this net are not only Ergin, DISH, EchoStar and SPSO, but any other company or controlled affiliate who is a Holder—as well as their successors, assigns, etc.  This extends beyond the arguable factual basis for the injunction based on SPSO's inequitable conduct and may be read to extend to persons and entities that have limited or no involvement in LightSquared's bankruptcy.  To the extent that the adversary proceeding and the Bankruptcy Court's decisions of June and July 2014 provide a sound basis for injunctive relief, they do so as to Ergen, DISH, EchoStar and SPSO only—not the host of other Holders and their affiliates.[19]

These two issues are all the more problematic when read against the scope of Injunction B.  As written, clause (i) provides that any action which may, inter alia, "impede" or "adversely affect" Plan Transactions is enjoined.  (Confirmation Order ¶ 36.b, App. A00077.)  As set forth above, the definition of "Plan Transactions" is extraordinarily broad and includes "one or more transactions to occur on or before the Effective Date or as soon thereafter as reasonably practicable, that may be necessary or appropriate to effect any transaction described in, approved by,

---

[19] LightSquared points out that none of its other competitors—including AT&T, Verizon, and Sprint—have challenged the scope of Injunction B despite having notice and standing to object.  But those entities' decisions to remain silent, which may be due to their beliefs that LightSquared only intends to use the injunction against SPSO and its affiliates, proves nothing about whether Injunction B as currently constructed is improperly overbroad and lacks in specificity.  This Court must consider the injunction based on its plain terms, not based on LightSquared's intention when drafting it or its promise to enforce the injunction in a manner that is narrower in scope than the existing language clearly permits.

contemplated by, or necessary to effectuate the Plan, including: . . . (c) all other actions that are consistent with the terms of the Plan that the New Investors, the Debtors, Reorganized LightSquared Inc. or New LightSquared, as applicable, determine are necessary or appropriate." (App. A00130.) This definition allows the term "Plan Transactions" to extend the injunction beyond reasonable limit, and makes it difficult, if not impossible, for enjoined parties to know precisely what conduct is prohibited.

Thus, transactions after the Effective Date are expressly captured, and essentially any action which the New Investors, the Debtors, Reorganized LightSquared Inc., or New LightSquared can imagine as consistent with or to effectuate the Plan, are included. This necessarily includes LightSquared's business plan, including post-emergence regulatory objectives, which could take several years to achieve. (See LightSquared's Memorandum of Law in Support of Confirmation of Second Amended Joint Plan ¶ 183, App. A01381 ("LightSquared's business plan involves exiting bankruptcy, resolving open regulatory issues with the FCC and other governmental agencies, and only then determining how to best put the spectrum to use . . .").)

Clause (iii) suffers from similar overbreadth. While the injunction was ultimately amended to include language that carves out petitioning the FCC (or any other governmental entity), that does not entirely solve the issue. By its terms, clause (iii) prohibits any action by any of the aforementioned parties, which may impede or affect any material regulatory request, License Modification, or FCC

objective, or take any act in furtherance of the matters referred to in clause (i).  This could, in short, be used to inhibit regular commercial activity such as vigorous contractual negotiations, interaction with international and non-governmental agencies and organizations that oversee spectrum usage and allocation, or actions including seeking acquisition of additional spectrum or of third parties necessary for utilization of existing spectrum.[20]  This goes beyond that which is necessary to protect LightSquared as it exits bankruptcy.  Market participants should not be prohibited from pursuing the use of their own spectrum and competing in the marketplace in an otherwise lawful manner.  See Mickalis, 645 F.3d at 145 ("An injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation.").

On its face, it is impossible to know with any degree of specificity the conduct that may be captured by Injunction B.  The provision also creates a serious risk of chilling ordinary commercial activity by other market participants in countless ways.  And that, ultimately, is the problem.

Because the Court believes that Injunction B's defects do not lend themselves to satisfactory resolution by a slight clarification of the existing language, this Court declines to modify the terms of Injunction B as part of its resolution of this

---

[20] While this Court does give some deference to the Bankruptcy Court's view that the injunction would not extend so broadly, see, e.g., In re Bernard L. Madoff Inv. Sec. LLC, 740 F.3d at 87 n.7 ("[A] bankruptcy's court's interpretation of its own order warrants customary appellate deference."), the Court nonetheless concludes that the defects discussed above warrant reconsideration of the language of the injunction to ensure that it is appropriately tailored to the legitimate ends sought by LightSquared.

appeal.  Cf. Kahara Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 500 F.3d 111, 130 (2d Cir. 2007) (modifying injunction "slightly" on appeal to the extent agreed upon by the parties).[21]  Under the circumstances, the Court believes that the better course is to vacate Injunction B and remand to the Bankruptcy Court in the first instance to reconsider the injunction in light of that Court's greater familiarity with the history of this matter and its understanding of the precise ends to which Injunction B was directed.  On remand, the Bankruptcy Court should clearly delineate precisely what conduct it seeks to enjoin, by whom and for how long.  This Court is certain that the Bankruptcy Court will carefully consider the extent to which normal competitive (if distasteful) conduct must be allowed following LightSquared's emergence from bankruptcy.

V.    CONCLUSION

For the reasons set forth above, this Court VACATES Injunction B and REMANDS the matter to the Bankruptcy Court to consider whether additional injunctive relief is appropriate and, if so, the specific terms and precise duration of such relief.

---

[21] The Court notes that it has considered, and discussed at oral argument, a proposed modified version of Injunction B submitted by SPSO as an Exhibit to its reply brief.  (Appellant's Reply Br., Ex. A, ECF 15-1; 6/4/2015 Oral Argument Tr. 47-48, ECF No. 17-1.)  The Court declines to impose this modified injunction, as it believes that the Bankruptcy Court, given its greater knowledge of the history of this action, is in the best position to craft an appropriately tailored revised injunction, to the extent that Court deems necessary, on remand.

The Clerk of Court is directed to terminate this action.

SO ORDERED.

Dated:          New York, New York
                October 7, 2015

_____
KATHERINE B. FORREST
United States District Judge